# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### CENTRAL DIVISION

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 7 |
| | ) | Case No. |
| GRETAG IMAGING, INC. | ) | 03-40225-HJB-MSH |
| | ) | |
| Debtor | ) | |
| | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER REGARDING TRUSTEE'S OBJECTION TO PROOF OF CLAIM OF ALBERTSONS, INC.

David Ostrander, the Chapter 7 trustee of the debtor, Gretag Imaging, Inc. ("GII"), has objected to the proof of claim of Albertsons, Inc., successor in interest to American Stores Company.[1]   The underlying dispute is over whether the debtor is liable to Albertsons under a contract and hence whether Albertsons may assert a claim against the debtor's bankruptcy estate.[2] The trustee insists that the debtor's sister company, Gretag Imaging AG ("GIAG"), but not the debtor, is liable under the contract.

This is a core matter over which the bankruptcy court has jurisdiction pursuant to 28 U.S.C. § 157(b)(2)(B).   After having heard and considered the testimony and demeanor of the witnesses who testified at the evidentiary hearing on the trustee's claim objection, and after reviewing the exhibits admitted in evidence, as well as the pre- and post-trial briefs submitted by the parties, the

---

[1]  Sometime in late 1998 or early 1999, Albertsons, Inc. acquired or merged with American Stores Company.   Subsequently, Albertsons Inc. was acquired by or merged into an entity known as Supervalu Inc.   During this proceeding and in this memorandum these entities have been identified at various times by all these names interchangeably.

[2]  The trustee filed an objection [docket # 528] and an amended objection [# 833] challenging the proof of claim on several bases..   I bifurcated the issues for trial at the parties' request, and conducted the evidentiary hearing solely on the issue of whether the debtor was the Gretag entity which had the contract with American Stores..

following constitute my findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052.

Facts

The debtor, GII, was one of nineteen related companies, thirteen of which used some form of the name "Gretag Imaging," involved in the manufacture, sale and servicing of photofinishing equipment including minilabs or the one hour photo processing units that are found in many supermarkets and drug stores.   GII, a Massachusetts corporation headquartered originally in Chicopee and later in Holyoke, Massachusetts, was a wholly-owned subsidiary of Gretag Imaging Group, Inc. which, in turn, was a wholly-owned subsidiary of Gretag Imaging Holding AG ("Holding").   The debtor's sister company, GIAG, was also a wholly-owned subsidiary of Holding and like Holding, operated out of the Gretag family of companies' world headquarters in Regensdorf, Switzerland.   GII filed its voluntary Chapter 7 petition commencing this case on January 13, 2003.   GIAG has filed its own bankruptcy in Switzerland.

In 1996, American Stores Company, which owned a nationwide chain of drugstores, entered into a master lease with Qualex, Inc., an Eastman Kodak affiliate, under which American Stores leased photofinishing minilabs from Qualex.   Qualex was one of the Gretag companies' major customers and many of the minilabs leased to American Stores were units manufactured by Gretag.

In or about 1998 the minilab photofinishing industry experienced a significant technology advancement.   Retailers who owned or leased minilabs and who wanted to remain competitive either had to replace their existing units with units which contained the new "APS" technology or retrofit their existing units with APS upgrades.   American Stores was one such retailer.

In the summer of 1998, a meeting took place at American Stores's headquarters in Salt Lake City, Utah to explore how American Stores's existing Gretag minilabs could be upgraded with APS technology or new machines leased or purchased at a cost acceptable to American Stores.   At the meeting were Michael Masten, the director of photo labs for American Stores, Mark DeSimone, a vice president of GII, and Peter Fitzgerald, president and chief executive officer of GIAG.

Following the meeting, Mr. Fitzgerald sent Mr. Masten a fax from GIAG in Switzerland offering to give American Stores a monthly rebate of $200 for every Gretag minilab American Stores leased from Qualex that was upgraded with the new APS photofinishing technology either by retrofitting existing units or acquiring new ones.

Further discussions between the parties ensued and on November 25, 1998, Mr. DeSimone sent a letter to Mr. Masten summarizing "our 1999 plan for American Stores" which included a "Financing Commitment" for a $200 rebate per month for all existing Gretag minilabs upgraded to APS functionality and a $200 rebate per month for all future APS enabled minilabs acquired by American Stores.

The November 25th letter was written on stationary of "Gretag Imaging" and signed by "Mark L. DeSimone for Peter Fitzgerald," identifying Mr. DeSimone as "Vice President Gretag Imaging."   Mr. DeSimone testified that the letterhead used for the November 25, 1998 letter was "generic letterhead" used by almost all Gretag Imaging companies.   Mr. DeSimone also testified that Mr. Fitzgerald wrote the November 25th letter but as he was out of the country and could not get an original letter to American Stores immediately as required, Mr. Fitzgerald had the letter prepared for Mr. DeSimone's signature and transmitted to Mr. DeSimone with instructions to sign

3

it.   Mr. DeSimone testified he first refused to sign because he believed the rebate deal with

American Stores was ill-advised but relented when Mr. Fitzgerald agreed that Mr. DeSimone

could add the reference "for Peter Fitzgerald" next to his name in the letter's signature block.   I

find that Mr. DeSimone's testimony that Mr. Fitzgerald wrote the November 25th letter but did not

sign it lacking in credibility.   The letter was transmitted to American Stores by facsimile and

Federal Express so an original did not have to be in American Stores' possession immediately.

Further, the letter was signed, not by Mr. DeSimone personally, but by an assistant on his behalf.

The same procedure could have been followed by Mr. Fitzgerald if he had been the author of the

letter.

In any event, American Stores accepted the proposal set forth in the November 25, 1998

letter, although not in writing, and during 1999, American Stores' photofinishing minilabs were

upgraded with APS technology according to the plan outlined in the November 25th letter.

Between November 2000 and August 2002, GII paid American Stores and its successor,

Albertsons, a total of $1,835,400 in rebates pursuant to the terms of the letter.   All American

Stores's invoices along with transmittal letters seeking rebate payments were addressed to "Gretag

Imaging Co." or "Gretag Imaging Company" at GII's address, first in Chicopee and subsequently

in Holyoke Massachusetts.   GII paid the invoices by checks drawn on GII's account.

Mr. Masten testified that at one point when rebate payments were overdue one of his

assistants contacted Mark DeSimone at GII about payment and was told that Mr. DeSimone was

waiting for authorization from Europe to write the check to American Stores.   Mr. Masten

testified that he understood the need for authorization as reflecting the fact that GII had

checkwriting limits, a common scenario in a hierarchical structure of corporate conglomerates,

4

and did not assume that an entity other than GII was obligated to make the payments.

Brian Bethke, an in-house attorney for American Stores, who had corresponded with Mr. DeSimone about payment of American Stores's invoices, testified that he understood that American Stores had a rebate agreement with the Gretag entity located in Massachusetts, namely the debtor, GII.   He further testified that the vendor number in American Stores's records with respect to its obligations under the rebate agreement referenced GII, the debtor.   Finally, Mr. Bethke testified that American Stores did not file a claim in GIAG's Swiss bankruptcy case because it did not believe it had a claim against GIAG nor did American Stores receive any notice from the Swiss bankruptcy court as to its being listed as a creditor of GIAG.

In schedule F of the schedules of assets and liabilities filed by GII as part of its bankruptcy petition in this court, GII listed American Stores as an unsecured creditor with an undisputed and non-contingent but unliquidated claim in the amount of $822,400 described as "rebates payable stemming from product reliability issues."   The description of the liability of the debtor, GII, to American Stores makes no reference to any intercompany status of the liability.   That the debtor knew how to do this is evidenced by the very next entry in schedule F for the liability of the debtor to UBS which is described as an assigned intercompany payable from another one of GII's affiliates, Gretag Imaging Trading.

On May 12, 2003, American Stores filed a proof of claim in GII's bankruptcy case asserting an unsecured non-priority claim against GII in the amount of $5,540,400.   The trustee objected to the proof of claim on a number of grounds but agreed to hold them all in abeyance except for his objection that the debtor owed American Stores nothing because GIAG and not the debtor was the proper party to the rebate agreement.

5

<u>Discussion</u>

The parties to this dispute concur that there exists a legally binding agreement regarding the rebate program for upgrades to American Stores's photofinishing minilabs. This agreement, however, was not reduced to a formal writing signed by the parties to be charged so that the definitive identify of those parties cannot be determined within the four corners of any single document.   Rather, the totality of the agreement must be pieced together from available documents as well as from the course of conduct of the parties.   Restatement 2d Contracts § 4 (1981) ("A promise may be stated in words either oral or written, or may be inferred wholly or partly from conduct.").   This is true whether the law of Massachusetts or Utah governs the agreement reached by the parties.   *See Popponesset Beach Ass'n, Inc. v. Marchillo*, 39 Mass. App. Ct. 586, 592, 658 N.E.2d 983, 987 (Mass. App. Ct. 1996); *Johnson v. Morton Thiokol, Inc*., 818 P.2d 997, 1004 (Utah 1991).

The substantive terms of the contract are not in dispute; they are set forth in the November 28, 1998 letter from Mr. DeSimone to Mr. Masten. The disagreement is over which Gretag entity is a party to the contract. Based on the evidence presented, I conclude that the Gretag entity is the debtor, GII.

That the debtor believed itself to be liable under the contract is established by the fact that the debtor listed its liability to American Stores on the schedules of liabilities accompanying its bankruptcy petition. These schedules are certified under the pains and penalties of perjury by the debtor's director, Colin Vigdal, as being true and accurate. The trustee correctly asserts that, unlike the debtor, he cannot be bound by the debtor's admission in its schedules.   *In re Jorczak*, 314 B.R.

474, 483 (Bankr. D. Conn. 2004).   Although he is not bound by the schedules, the scheduling of

the debt as undisputed and owed by the debtor is certainly evidence of the debtor's view of its

liability.   It also undermines Mr. DeSimone's testimony that he did not sign the letters setting

forth the essential terms of the contract on behalf of the debtor but rather on behalf of GIAG.

Moreover, the debtor held itself out to American Stores as the party with whom American

Stores had contracted to perform the rebate program.   All $1,835,400 in rebates were paid to

American Stores by checks drawn on the debtor's account.   The fact that Mr. DeSimone told Mr.

Masten that the debtor needed approval from its European headquarters before it could issue

payment of American Stores's invoices does not, as the trustee suggests, evidence that American

Stores knew or should have known that the real party to the contract was GIAG.   As Mr. Masten

testified, he assumed that the debtor simply required senior level approval before it could write

checks in excess of a certain amount.

Further, the November 25, 1988 letter was reasonably understood by American Stores to

represent the debtor's proposal to implement the rebate program.   The letter is signed by Mr.

DeSimone as vice president of Gretag Imaging.   The only Gretag Imaging entity of which Mr.

DeSimone was an officer was the debtor.   The fact that Mr. DeSimone inserted the words "for

Peter Fitzgerald" next to his name in the signature block of the letter changes nothing.   Mr.

Masten testified that while he understood Mr. Fitzgerald to have been Mr. DeSimone's superior,

he did not know nor did he have any interest in knowing the technical corporate chain of command

within the Gretag Imaging family.   The letter merely reflects that Mr. DeSimone was writing for

Mr. Fitzgerald, his superior in the company in which Mr. DeSimone was a vice president. That

company was the debtor.   Indeed, an October 31, 2000 letter from American Stores transmitting

rebate invoices is addressed to "Peter Fitzgerald, President" of "Gretag Imaging Co." at the

debtor's address in Chicopee Massachusetts, indicating that American Stores believed Mr.

Fitzgerald was the debtor's president.

Furthermore, as suggested previously, any ambiguity in Mr. DeSimone November 28th

letter concerning which Gretag Imaging entity was presenting the rebate proposal was

self-inflicted.   It was Gretag's choice to shroud its business affairs in a cloak of mystery by using

"generic letterhead."   Whether this was a premeditated business strategy or simply sloppiness, the

Gretag Imaging companies, including the debtor, must bear the consequences of their choice.   It

would be inequitable to allow the trustee to exploit the ambiguous nature of Gretag Imaging's

letterhead by penalizing American Stores.   In any event, American Stores' conduct establishes

that it was not confused by the November 25th letter.   American Stores consistently behaved as if

the debtor was its counterparty.   The vendor number assigned by American Stores to the rebate

transaction was in the name of the debtor. Invoices were addressed to the debtor and the debtor

paid them.   The fact that Mr. DeSimone opposed the rebate deal with American Stores does not

change the result.   This information was never conveyed to American Stores nor is it consistent

with the actual course of conduct of the parties from 1998 forward.

Remainder of page intentionally blank

8

<u>Conclusion</u>

For the foregoing reasons, the trustee's objection to the proof of claim of American Stores is overruled.

A hearing on the trustee's amended objection to the proof of claim will be scheduled.

At Worcester, Massachusetts this 6th day of October, 2011.

By the Court,

Melvin S. Hoffman
U.S. Bankruptcy Judge

Counsel Appearing:    David W. Ostrander
Ostrander Law Office
Northampton, MA
for David W. Ostrander, Chapter 7 trustee

James F. Coffey
Nutter, McClennan & Fish LLP
Boston, MA
for Supervalu Inc.