**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**CENTRAL DIVISION**

| | |
|---|---|
| In re:<br><br>GRETAG IMAGING, INC.<br><br>             Debtor | Chapter 7<br>Case No. 03-40225-HJB<br>(contested matter specially<br>assigned to MSH) |

**MEMORANDUM OF DECISION ON CROSS MOTIONS FOR SUMMARY JUDGMENT OF CHAPTER 7 TRUSTEE AND SUPERVALU INC.**

This matter came before me for a hearing on cross motions for summary judgment filed by David Ostrander, the chapter 7 trustee of the estate of the debtor in this case, and Supervalu Inc. in connection with the trustee's further amended objection [#833] to the proof of claim of Albertson's, Inc., successor in interest to American Stores Company and predecessor in interest to Supervalu Inc.[1] The claim objection was bifurcated at the parties' request and following an evidentiary hearing on the first part of the bifurcated objection, I found that the debtor in this case, rather than a non-debtor affiliate, was the party which had contracted with Supervalu and thus overruled that part of the trustee's objection. *In re Gretag Imaging, Inc.*, 03-40225, 2011 WL 4710815 (Bankr. D. Mass. Oct. 6, 2011) ("*Gretag I*"). With Supervalu's claim having survived part one of the trustee's bifurcated objection, the parties turned to the remaining grounds for the objection resulting in the motions for summary judgment that are now before me.

---

[1] Sometime in late 1998 or early 1999 Albertson's, Inc. acquired or merged with American Stores resulting in a national chain of approximately 1800 drug and grocery stores. Throughout this preceeding the names American Stores and Albertson's have been used interchangeably. American Stores/Albertson's apparently has merged with or otherwise has become known as Supervalu Inc. For ease of reference, unless the context demands otherwise these entities will hereinafter be referred to as "Supervalu."

1

**Facts**

The salient facts are briefly summarized here. A more expansive factual recitation may be found in *Gretag I*.

Gretag manufactured photofinishing minilabs, the one-hour photo processing machines found in many supermarkets and drugstores. Effective November 1, 1996, American Stores, which at that time owned a nationwide chain of drug stores, entered into a master lease with Qualex, Inc., an affiliate of Eastman Kodak, to lease such minilabs. As is typical, the master lease provided that separate lease schedules for each minilab would be appended to the master lease and that each lease schedule was to be deemed a separate contract under the master lease. The master lease does not mention Gretag by name. By an omnibus amendment to the master lease dated November 30, 1999, lease schedules for Gretag machines were added to the master lease.[2] The master lease, including those lease schedules incorporated by the omnibus amendment, was to run through October 31, 2006. By 1998, however, rapid improvement in photofinishing technology began forcing retailers who wanted to continue to offer competitive photofinishing services either to replace their outdated minilabs or to retrofit them with a new "APS" technology.

In the late fall of 1998, a meeting took place in Salt Lake City, Utah between representatives of American Stores and Gretag to discuss how American Stores could acquire updated minilabs at a reasonable cost. Following the meeting Gretag's representative sent American Stores a letter offering to pay American Stores a rebate of $200 per month for each Gretag-made minilab with the APS technology leased or retrofitted by American Stores. The letter provided that the rebates for the retrofitted and new minilabs would be paid monthly over a

---

[2] The schedule attached to the omnibus amendment lists over 800 pieces of equipment the overwhelming majority of which are described as "Gretag 740+."

period that would be "coterminous with the remaining Lease," which the parties agree refers to the master lease between American Stores and Qualex. American Stores accepted Gretag's proposal, although not in writing, and during 1999 its minilabs were upgraded or replaced with units incorporating the APS technology. In total, Supervalue leased 513 minlabs that qualified for Gretag's rebate plan. Between November 1, 2000 and July 19, 2002, Gretag paid Supervalu a total of $1,835,400 in rebates. Then the rebate payments stopped.

On January 13, 2003, Gretag filed a voluntary petition under chapter 7 of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*) commencing this case. Gretag listed Supervalu on its schedule of creditors holding unsecured non-priority claims as holding an undisputed, non-contingent but unliquidated unsecured claim in the amount of $822,400 arising from the rebate program. Supervalu timely filed a proof of claim asserting it was owed $5,540,400 in unpaid rebates.

The trustee objected to Supervalu's proof of claim on a number of grounds,[3] including that a non-debtor affiliate of the debtor and not the debtor itself was liable to Supervalu under the rebate program. The trustee's objection was bifurcated to allow for a threshold determination as to which entity was obligated to Supervalu since a ruling in the trustee's favor would obviate the need to address any other issues. Having determined in *Gretag I* that the debtor is indebted to Supervalu, it is necessary to rule on the remaining objections by the trustee to Supervalu's claim and to Supervalu's arguments in support of its claim.

## Positions of the Parties

The trustee has objected to the allowance of Supervalu's claim for several reasons in addition to the threshold identity objection addressed in *Gretag I*. First, asserting that Utah law

---

[3] The trustee filed the original objection [# 528] on September 8, 2009, followed by an amended objection [# 743] on June 7, 2010, and a further amended objection [#833] on March 5, 2010.

3

is applicable to the dispute between the parties, the trustee claims that the rebate agreement is void under the Utah statute of frauds, Utah Code Ann. § 25-5-4 (2004), and that Utah law does not recognize partial performance of a contract as an exception to the statute of frauds in an action at law. Second, he alleges that Supervalu's proof of claim lacks adequate supporting documentation. Third, he argues that Bankruptcy Code § 502(b) requires that Supervalu's claim, which includes post-petition damages, must be present-valued as of Gretag's bankruptcy petition date. Finally, he alleges that the claim should be disallowed under § 502(d) of the Bankruptcy Code because $1,220,400 of the rebates paid to Supervalu within one year of the debtor's filing for bankruptcy constituted fraudulent transfers under Bankruptcy Code § 548(a)(1)(B).

In his motion for summary judgment the trustee pressed only his arguments with respect to the statute of frauds and the reduction of the claim to its present value as of the petition date. In his opposition to Supervalu's cross motion for summary judgment, however, he raised Supervalu's failure to provide sufficient evidence as to its entitlement to the rebates, specifically alleging that Supervalu had not demonstrated that it made its equipment lease payments to Qualex on all 513 minilabs. In a status report filed on November 15, 2011, the trustee expressly waived his objection to the allowance of the proof of claim under § 502(d).

Supervalu, while agreeing to the applicability of Utah law, disputes the trustee's assertion that the rebate agreement runs afoul of the statute of frauds. Supervalu maintains that the testimony and exhibits introduced into evidence at the prior evidentiary hearing in this matter established that Qualex had delivered to Supervalu's predecessors 513 minilabs which qualified for the rebate program and that those machines remained at their locations through at least October 31, 2006. Supervalu notes that its right to receive rebates was in no way conditioned on its making equipment lease payments to Qualex but in any event asserts that, in fact, it had made

4

all of the lease payments. Finally, Supervalu challenges the trustee's argument that Bankruptcy Code § 502(b) mandates that its claim be reduced to its present value and further suggests that even if the statute provides for present-valuing a claim, to do so here would be inequitable.

## Summary Judgment Standard

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of a material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), made applicable by Fed. R. Bankr.P. 7056.[4] A "genuine" issue is one supported by such evidence that "a reasonable jury, drawing favorable inferences," could resolve in favor of the nonmoving party. *Triangle Trading Co. v. Robroy Indus., Inc.,* 200 F.3d 1, 2 (1st Cir. 1999) (quoting *Smith v. F.W. Morse & Co.,* 76 F.3d 413, 427 (1st Cir. 1996)). "Material" means that a disputed fact has "the potential to change the outcome of the suit" under the governing law if the dispute is resolved in favor of the nonmovant. *McCarthy v. NW. Airlines, Inc.* 56 F.3d 313, 314–15 (1st Cir. 1995). The moving party bears the initial responsibility of informing the court of the basis for its motion and "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[A] party seeking summary judgment always bears the initial responsibility of informing the ... court of the basis for its motion, and ... [must] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  "Only if the record, viewed in that manner

---

[4] The claim objection is a contested matter under Fed. R. Bankr. P. 9014 to which Fed. R. Bankr. P. 7056 applies. *See* Fed. R. Bankr. P 9014(c).

5

and without regard to credibility determinations, reveals no genuine issue as to any material fact may the court enter summary judgment." *Cadle Co. v. Hayes*, 116 F.3d 957, 959 (1st Cir. 1997).

## Discussion

<u>Statute of Frauds</u>

The parties agree that Utah law applies in determining the enforceability of the rebate agreement.

In relevant part, Utah's statute of frauds provides that:

The following agreements are void unless the agreement, or some note or memorandum of the agreement, is in writing, signed by the party to be charged with the agreement:

(a) Every agreement that by its terms is not performed within one year from the making of the agreement….

Utah Code § 25-5-4(1). There is no dispute that the rebate program was to proceed longer than one year from the November 1998 letter. The letter contemplated that Gretag's financial commitment of $200 per month for all new and upgraded equipment was to continue through the term of the Qualex master lease, namely October 31, 2006. Therefore, to be enforceable the rebate agreement must be memorialized in a writing that satisfies the Utah statute of frauds..

"It is fundamental that the memorandum which is relied upon to satisfy the statute of frauds must contain all the essential terms and provisions of the contract." *Birdzell v. Utah Oil Refining Co.,* 121 Utah 412, 416, 242 P.2d 578, 580 (1952). The trustee argues that the 1998 letter agreement lacks an essential term, the number of units for which rebates would be paid. Although the November 1998 letter does not supply the exact number of units covered by the agreement, as indeed it could not since it contemplated that machines leased or upgraded in the future would be covered by the rebate program, the letter provides a definite framework for determining the number of units that qualify by referring to "all existing 740 Plus' that are

6

upgraded to APS functionality" and "all future 740 Plus' with APS installations." All that remained for the parties to do was to count the number of Gretag 740 Plus units equipped with APS technology that Supervalu leased from Qualex each month in order to calculate the amount of each month's rebate. There appears to be no dispute that the parties did just that between November 2000 and July 2002. *Cf. Coulter & Smith, Ltd. v. Russell*, 976 P.2d 1218, 1222 (Utah App.1999) (option agreement that permitted developer to buy lots of land that he was to develop according to local annexation and zoning requirements satisfied statute of frauds because specific land description would arise from annexation and zoning process without need for parties to option agreement to negotiate land descriptions). I find as I found in *Gretag I* that the November 1998 letter agreement contains all the essential terms of the contract between the parties and thus I find that it satisfies the Utah statute of frauds. Having so found, it is not necessary to decide whether Gretag's partial performance of the agreement through July 19, 2002 can substitute for compliance with the statute of frauds in an action at law for damages.

Documentation Supporting the Proof of Claim

A proof of claim filed pursuant to the Federal Rules of Bankruptcy Procedure represents prima facie evidence of the validity of the claim. Fed. R. Bank. P. 3001(f); *see also In re Long,* 353 B.R. 1, 13 (Bankr. D. Mass. 2006). The party objecting to the claim must provide "substantial evidence" to refute its prima facie validity. *Id. citing United States v. Clifford (In re Clifford)*, 255 B.R. 258, 262 (D. Mass. 2000). If the objecting party successfully rebuts the prima facie validity of the claim, the burden then shifts to the claimant to demonstrate that the claim is valid. *In re Long*, 353 B.R. at 13 *citing Juniper Dev. Group v. Kahn (In re Hemingway Transp., Inc.)*, 993 F.2d 915, 925 (1st Cir. 1993). The claimant must so demonstrate by a preponderance

7

of the evidence. *In re MacMillan*, 02-11808-JMD, 2003 WL 22454871 (Bankr. D.N.H. Oct. 20, 2003) *citing In re Colonial Bakery, Inc.*, 108 B.R. 13, 15 (Bankr. D.R.I. 1989).

Albertson's timely filed a proof of claim signed by an individual purporting to be the company's vice president and assistant treasurer. A copy of Gretag's November 25, 1998 letter to American Stores is attached along with a list that bears the following heading:

> "Albertson's Inc. and It's [sic] Subsidiaries
> Upaid Rebates Through Ending Date November 1, 2006
> $200.00 per Period per Store
> 9 Periods 2002; 12 Periods 2003, 2004, & 2005; 9 Periods 2006
> Each Store Total= $10,800."

What follows is a list of 513 stores, identified by store number, where a minilab which qualified for the rebate program was located and the date on which the qualifying equipment was installed. All of the qualifying equipment was installed prior to July 19, 2002 when Gretag stopped making the rebate payments. According to the list and its heading, Gretag owed $200 a month for 54 months for 513 locations for a total of $5,540,400.

Since Supervalu's proof of claim enjoys prima facie validity, the burden shifts to the trustee to come forward with "substantial evidence" to rebut the claim. In challenging the validity of the claim, the trustee alleges only that there is no evidence that Supervalu made the equipment lease payments to Qualex. Assuming that the trustee has standing to raise this argument and is correct that Supervalu's entitlement to the rebates from Gretag was conditioned upon Supervalu's making the lease payments to Qualex, at best the trustee has rebutted the prima facie validity of Supervalu's claim and has succeeded merely in shifting back to Supervalu the burden to prove that it made the lease payments. At the evidentiary hearing on the issue of whether the debtor was the party responsible for making the rebate payments, both Michael Masten, who had been the director of photo shop for American Stores, and Brian Bethke,

8

Supervalu's director of merchandising and marketing law, testified that American Stores had made all of the payments to Qualex called for under the master lease.[5] The trustee offered nothing to rebut this testimony, stating only that Supervalu failed to produce its payment records or receipts from Qualex. But Supervalu is not required to produce documentary evidence. The uncontroverted trial testimony is sufficient. Thus, Supervalu has carried its burden to establish the validity of its claim.

Present-Valuing the Claim

The trustee argues that all rebate payments which would have been due post-petition must be discounted to their present value as of the bankruptcy petition date. Citing *In re Loewen Group Int'l, Inc.*, 274 B.R. 427 (Bankr. D. Del. 2002), the trustee maintains that courts uniformly require that post-petition payments included in a creditor's bankruptcy proof of claim be reduced to present value[6] as of the bankruptcy petition date.

Bankruptcy Code § 502(b) requires the court to determine the amount of a claim to which an objection has been interposed "as of the date of the filing of the petition." Based upon this

---

[5] Trial testimony of Michael Masten, Volume 1 at 149: 19-22 attached as exhibit 32 to Albertson's Statement of Material Facts [document #1203]. Trial testimony of Brian Bethke, Volume 2 at 48:14-25 to 49: 1-23.

[6] As the court in *Matter of Fi-Hi Pizza, Inc.*, 40 B.R. 258, 261 -62 (Bankr. D. Mass. 1984) explained:

> Present value is not necessarily a legal concept, but rather a term of art used by the economic and financial communities. One author has defined it as: the value today of a future payment or stream of payments, discounted at the appropriate discount rate. Put another way, present value reflects the financial reality that a dollar that is received in the future, is not worth the same as a dollar in hand today. Not only does inflation deflate the value of what a dollar may purchase in the future, but a party that has a dollar today may invest it in a variety of investments that would yield a return.

9

phrase, many courts, including the court in *Loewen*, 274 B.R. at 432, have concluded that a bankruptcy proof of claim which includes a component for future damages or payments must be discounted to present value as of the bankruptcy petition date. *Pension Benefit Guaranty Corp. v. Belfance (In re CSC Industries, Inc.)*, 232 F.3d 505 (6th Cir. 2000) ("prudent investor rate" appropriate rate to use to present value PBGC's claim for unfunded benefit liabilities).[7] *See also In re CF & I Fabricators,* 150 F.3d 1293, 1300 (10th Cir.1998) ("To insure the relative equality of payment between claims that mature in the future and claims that can be paid on the date of bankruptcy, the Bankruptcy Code mandates that all claims for future payment must be reduced to present value.").

Supervalu, citing *In re Oakwood Homes, Corp.*, 449 F.3d 588 (3d Cir. 2006), argues that discounting its claim by present-valuing post-petition payments would be inappropriate. In *Oakwood* the Third Circuit Court of Appeals, in a two to one decision, reversed the district court's order affirming the bankruptcy court's present-valuing the claims of certain certificate holders. The bankruptcy court applied the present value discount in addition to disallowing the holder's claims for unmatured interest in accordance with Bankruptcy Code § 502(b)(2). In reversing, the Third Circuit undertook an examination of the language of § 502(b) and concluded that it did not contain a clear directive to present-value all future claims.

> Stated simply, 11 U.S.C. § 502(b) speaks in terms of determining the "amount" of a claim "as of" the petition date. However, given that the remainder of the Bankruptcy Code uses the term "value, as of" to signify discounting to present value, and "amount" and "value" are not synonymous, we cannot say that § 502(b) clearly and unambiguously requires discounting to present value in all situations.

*Id.* at 595. Section 502(b) contains a series of exceptions to the statute's general mandate that the court value claims as of the petition date and allow them in such amounts. Excluded from

---

[7] The prudent investor rate has been rejected by courts in this circuit. *See In re Wolverine, Proctor & Schwartz*, 436 B.R. 253, 259 (D. Mass. 2010)

10

allowance are, among other things, claims for unmatured interest (§ 502(b)(2)), claims for certain lease rejection damages (§ 502(b)(6)), and certain employment contract termination damage claims (§ 502(b)(7)). If § 502(b) required all claims to be present-valued, there would be no need for these exceptions. Indeed, as the Third Circuit observed in *Oakwood*, requiring both present valuing claims and disallowing unmatured interest would amount to impermissible "double discounting." *Id*. at 601.

*Oakwood* involved a claim on an interest-bearing financial instrument and so § 502(b)(2) applied to the claim. While Supervalu's claim is non-interest-bearing, the reasoning of the Third Circuit is equally compelling. Had Supervalu sued Gretag prior to its bankruptcy filing for breach of the rebate agreement, Supervalu would have been entitled to seek judgment for the entire stream of payments contemplated under the agreement, not just the payments missed up to the date of suit. Had Supervalu obtained a final judgment for all amounts, both overdue and to be due, under the contract it would have been entitled to file a claim in Gretag's ensuing bankruptcy and have that claim allowed in full because that would have been the amount of its claim on the bankruptcy petition date. The fact that Supervalu did not sue Gretag for breach of contract and obtain judgment pre-petition should not alter the treatment of Supervalu's claim. I will therefore overrule the trustee's objection insofar as it seeks a reduction of Supervalu's claim based on discounting its value as of Gretag's bankruptcy petition date.

Having concluded that § 502(b) does not mandate present-valuing Supervalu's claim, it is not necessary to address Supervalu's fallback argument that equity warrants not imposing a time value discount on its claim.

## Conclusion

For the reasons stated above, the trustee's motion for summary judgment is DENIED and

11

Supervalu's motion for summary judgment is GRANTED.

    Separate orders shall issue.

Dated: January 9, 2013                          By the Court,

                                                          Melvin S. Hoffman
                                                          U.S. Bankruptcy Judge

Counsel appearing:

    Keith A. Minoff, Law Offices of Keith a. Minoff, P.C., Springfield, MA
    for David Ostrander, Chapter 7 Trustee

    James Coffey and Benjamin Mack, Nutter, McClennan & Fish, LLP, Boston, MA
    for Supervalu Inc.